# EXHIBIT 5
# Signorino Deposition

right?
**A Yes, yes.**
Q And at this time, we still only see two people on the forward end of the hatch?
**A That's correct.**
Q Okay. He walks to the container, kind of jiggles it as best he can, right?
**A I think he's still not at the container yet.**
Q I thought he put his hands on the container right here about two minutes and 40 seconds. Mr. --
**A Yeah, yeah, yeah, yeah. Okay. So --**
Q Looks he and Mr. Maldonado were pulling on it trying to make sure it was -- it was squarely landed.
**A Right. He's -- he's locking the base lock.**
Q Okay. And then he takes his hands off the container, and he walks a little further towards the center line, correct?
**A Right.**
Q Bends down, picks something up?
**A Right.**
Q What would you anticipate that he was picking up?
**A Perhaps a twist lock.**



Q Okay.
(Playing video.)
Q (By Mr. Lightsey) And now he walks back towards the container, correct?
**A (Witness nods head up and down).**
Q And it looks like he's starting to raise a rod of some sort up. His hands on up.
You see -- see that rod right there?
**A I don't.**
Q I've got a bigger screen than you.
All right. And he falls at approximately two minutes and 50 seconds into the video, correct?
**A Correct.**
Q I'm going to back up just a little bit. This is at 2:44. Mr. McCray has picked up whatever he -- I think he said he picked up the rod of some sort or pole.
**A Yep.**
Q And he put it over his head when he falls?
**A Yep, yep.**
Q Okay. So just so I'm clear, have you ever been aboard this ship the Maersk TENNESSEE?
**A No. No, I have not.**
Q Did you have an opportunity to inspect the



grate in question?
**A Not -- not the grates onboard the TENNESSEE, no. I was never aboard the TENNESSEE.**
Q And so, then you didn't have a chance to either inspect the grates, nor did you have a chance to inspecting the framing of the grates correct?
**A That's correct.**
Q And that also means you didn't get a chance to inspect the clamps that were holding the grating in place, correct?
**A Correct. Yeah, I've only seen photographs of -- of that equipment.**
Q Yes, sir.
And have you ever been on this ship at any other time?
**A Not to my recollection, I don't think so. Even before she was renamed, I -- I don't think I was ever aboard this particular ship.**
Q Now, I presume there are some similarities in the systems for catwalks and gratings, but you don't know the specifics for this particular ship at this particular location, correct?
**A Yeah. You're -- you're correct, there are plenty of similarities, but I really -- I could**



**not say with great authority what the case was on this particular ship.**
Q Okay. So at the time that the video starts until the time of the accident, best we can tell, there are two people, Mr. McCray and Mr. Maldonado, on the forward end of the hatch, correct?
**A Correct.**
Q I'm starting the depo -- the video again at 2:53, right after Mr. McCray has fallen into the hole.
(Playing video.)
Q (By Mr. Lightsey) Looks like Mr. Maldonado goes over there. The crane boom is moved, and now we can't see anything for several minutes.
**A Right.**
Q Okay. So I'm going to fast-forward a little bit, because we can't see anything for a while until it moves.
**A Yeah. Yep.**
Q It looks like the crane starts moving again at about 6:55, and it clears the video. We can now see Mr. McCray and Mr. Maldonado, right?
**A Right.**
Q And at this time, it looks like

Page 105

faulty condition?
A **I don't know.**
Q Okay.
MR. LIGHTSEY: Just so I know what my schedule is, you have a deposition at 2:00. And is that 2:00 o'clock East Coast time?
**THE WITNESS: Hang on, let me take a look here.**
MR. LIGHTSEY: I don't plan on going that long. I just want to make sure. I don't want to jam you up.
**THE WITNESS: On Thursday, 1:30 Eastern Daylight Time. Yeah, 1:30.**
MR. LIGHTSEY: Okay.
**THE WITNESS: But, you know, I told them that I had a deposition in the morning and that we may start a little late. So they're aware, at least, that I've got some responsibilities with you guys.**
MR. LIGHTSEY: Well, I thank you, and I will try to -- to move along so that you can have a few minutes between depos, at least.
**THE WITNESS: Okay. Thank you very much.**
Q (By Mr. Lightsey) All right. So you've done no

Page 106

physical testing on the grate in question, right?
A **I have not. I wish I had.**
Q Right.
No measurements?
A **No. No. Apart from what I can see in photographs, no measurements.**
Q So you haven't had an opportunity to conduct any studies or analysis other than the photographs to come to your conclusions?
A **That's correct.**
Q And out of these multiple possibilities that may have resulted in the grating falling, we just don't know -- we don't have any evidence what -- what that particular possibility was, correct?
A **I don't know exactly what caused it. I just know that it happened.**
Q Fair enough.
We don't have any information that indicates that Maersk knew about this potential hazard before the accident, right?
A **At -- at this particular location, no. No.**
Q And the invest -- the inspection that was done six days prior to Mr. McCray's incident, you

Page 107

don't expect these catwalks and gratings to be inspected to that degree every day, correct?
A **No. In normal use, I -- I would think not.**
Q And you have not identified any rule, regulation or industry standard that Maersk violated as it relates to inspecting this catwalk and grating?
A **No.**
Q So if -- if I -- if -- if I -- I understand your testimony -- I don't want to put words in your mouth, and I guarantee Brent doesn't want me doing that.
MR. ALLISON: Only if they're good words.
MR. LIGHTSEY: Yeah, that's not going to happen if I'm doing my job.
Q (By Mr. Lightsey) We know the accident happened; we don't know why?
A **Essentially, yes. Uh-huh.**
MR. LIGHTSEY: Brent, can I get a few moments off the record just to look at my notes, and hopefully I'll be done any moment now?
MR. ALLISON: Yeah, sounds perfect.
MR. LIGHTSEY: Thanks, Taye. Thanks,

Page 108

Brent. And obviously you, Mr. Signorino.
THE WITNESS: No problem, Tom. I'm good.
MR. LIGHTSEY: Thank you.
(Break from 12:13 p.m. to 12:16 p.m.)
Q (By Mr. Lightsey) Mr. Signorino -- by the way, can I call you "Roland," [sic] 'cause I'm -- I'm stumbling over your last name. I apologize.
A That's okay. You can call me "Ron."
Q "Ron," excuse me. Thank you. My bad.
The documents that we looked at that were referenced in your report, these are the documents that you relied upon in coming to your conclusions today, correct?
A That's correct.
Q Okay. Based on the records that you have before you so far, it appears that Maersk exercised reasonable care in inspecting this grating, correct?
MR. ALLISON: Object to form.
A Yeah, it -- it -- it seems that they -- they had some oversight. I -- I cannot say that it was completely reasonable, but they had some oversight that -- that -- that was fairly